# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| DENNIS L. MILLER, <br><br> Plaintiff, <br><br> vs. <br><br> MICHAEL J. ASTRUE, <br> Commissioner of Social Security, <br><br> Defendant. | No. C08-4016-PAZ <br><br> **MEMORANDUM OPINION AND ORDER** |

This matter is before the court for judicial review of a decision by an administrative law judge ("ALJ") denying the plaintiff's application for Title XVI supplemental security income benefits. The plaintiff Dennis L. Miller protectively filed the application on June 29, 2004, alleging a disability onset date of February 1, 2000. Miller had filed a previous application for SSI benefits on April 3, 2001, also alleging a disability onset date of February 1, 2000. That application was denied by the Commissioner after an ALJ hearing on October 23, 2002, and the denial was upheld by this court in a ruling issued on May 19, 2004. *See* Doc. No. 10 in C03-4050-PAZ (May 19, 2004).

Miller's new application was denied initially and on reconsideration. He had a hearing on March 21, 2006, before the same ALJ who reviewed his earlier application. On April 27, 2006, the ALJ denied Miller's new application. The Appeals Council denied his request for review on December 28, 2007, making the ALJ's decision the final decision of the Commissioner.

Miller alleges he continues to suffer from chronic pancreatitis, an impairment the ALJ found to be severe. Miller also has a history of a pancreatic pseudocyst that required surgery at one point, gastroesophageal reflux disease, and degenerative disk disease. The ALJ found these impairments to be severe as well, but found that none of Miller's

impairments, singly or in combination, met or equaled an impairment listed in the regulations. *See* 20 C.F.R. part 404, subpart P, app. 1; 20 C.F.R. §§ 416.920(d), 416.925, 416.926. These findings are not challenged by Miller, and in any event are affirmed by the court.

There is no dispute that Miller continues to have symptoms from his pancreatic condition. The question is whether these symptoms, together with his other symptoms and his alleged mental health problems, are so severe that they would preclude Miller from performing any type of work. The ALJ found Miller retains the capacity to perform a range of light, unskilled work. This court must determine whether the ALJ applied the correct legal standards, and whether his factual findings are supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citations omitted). In this deferential review, the court considers the record in its entirety to determine whether a reasonable mind would find the evidence adequate to support the Commissioner's conclusion. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citations omitted); *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006).

Miller argues the ALJ failed to give appropriate weight to treatment records from the University of Iowa Hospitals and Clinics; to a Functional Capacity Evaluation ("FCE") he underwent on March 14, 2006; and to a mental health evaluation performed by T.R. Liautaud, D.O. on March 15, 2006. The court will not revisit in detail the medical history summarized in its earlier ruling, but will discuss these three items.

Between June 29, 2004 (the date of his current application), and April 27, 2006 (the date of the second ALJ hearing), Miller was evaluated and treated at the University of Iowa Hospitals and Clinics on four separate occasions. On September 28, 2004, he saw Frederick Johlin, M.D. with complaints of burning epigastric abdominal pain radiating into his chest, worse at night. He stated he had frequent acid regurgitation. He also

2

complained of diarrhea, fullness, and bloating. Miller stated he is fatigued throughout the day and sleeps almost fifteen hours a day. Dr. Johlin also noted that "perhaps Mr. Miller has some underlying depression." An ultrasound of his pancreas was normal.

Dr. Johlin recorded the following impressions in the hospital records:

> Mr. Miller has chronic pancreatitis. His pseudocyst has resolved but now he has problems with chronic diarrhea and heartburn. We will change the cimetidine to Prilosec 20 milligrams once a day. We will also plan on obtaining an upper endoscopy with biopsies of his esophagus, stomach, and small bowel to rule out celiac disease. We will also check for bacterial overgrowth during the upper endoscopy and obtain a small bowel biopsy by obtaining a culture. We have reinstituted Viokase, one tablet with snacks, two tablets with light meals, and three tablets with heavy meals, as he has lost some weight since his last visit and continues to have diarrhea. We will also check a TSH and iron studies. We are a bit concerned about some of the thoughts of death that the patient has and are worried about underlying depression. This will need to be addressed at his next visit. It appears that a lot of his mood and affect problems are due to his underlying disease. If we can get this under control, we are hoping that his overall mental health improves, as well. If his burning does not improve with more aggressive acid suppression and there is no evidence of esophagitis on endoscopy, one must also consider and rule out cardiac etiologies.

A.R. 500. Dr. Johlin prescribed Creon, a proton pump inhibitor, and Paxil for depression. Three weeks later, on October 20, 2004, Miller returned to the clinic for an upper GU endoscopy. No abnormalities were found.

Miller again was seen at the clinic on November 15, 2004, and consulted with Christophe Goerdt, M.D. Miller had stopped taking the proton pump inhibitor after three days because he felt his reflux had become severely worse. Dr. Goerdt noted, "The esophageal reflux is the major thing limiting his quality of life." He observed that Miller smoked one-half pack to one pack of cigarettes per day. Miller's physical examination was

3

normal, but his affect was flat. Dr. Goerdt recommended that the proton pump inhibitor be tried again. He also suggested that smoking was contributing Miller's heartburn, and prescribed smoking cessation measures. He told Miller to follow up at the clinic in a month.

Miller did not return to the clinic until six months later, when he saw David G. Mulder, M.D. on April 4, 2005. Dr. Mulder noted that "[s]ince starting the Prevacid last time, [Miller's] heartburn has considerably improved." Except for a urinary tract issue, Miller had no complaints. Miller continued to smoke a half pack of cigarettes per day.

On March 14, 2006, a week before the ALJ hearing, Miller underwent a FCE at Buena Vista Regional Medical Center. A.R. 516-550. He was referred for this examination by his attorney. Miller's diagnostic history was pancreatitis and low back pain. Under "Current Complaints," the examiner noted, "Individual displayed symptoms inconsistent with low back pain as evidenced by his testing during Waddell Nonorganic Signs testing." A.R. 516-17. Under "Behavioral Profile," the examiner wrote:

> Individual displayed an inability to follow 1-step directions on a consistent basis. 5 times during the course of testing he stopped his activity and a blank stare was noted in a direction other than what he was attending to. Directions needed to be restated to continue with the task.

R. 517. Under "Physical Findings," the examiner wrote:

> **Posture**
> Client displays a mild kyphotic curve of the thoracic vertebrae. Scapulaes are equidistant in relationship to the spine.
>
> **Mobility**
> Upon visual inspection, patient has a limp with decreased weight bearing on the left.

4

**Non-Organic Signs**

Patient scored 4 of 5 on Waddell's signs[1] potentially indicating the presence of non-organic symptomology.

**Pain**

Patient reports pain as 5 on a scale of 0-10.

**Sensation**

Individual reports no abnormal sensory disturbances in the R) or L) hand.

**Strength**

Patient's strength was found to be within normal limits or 5/5 for BUE's and BLE's all joints planes of movement.

**Balance**

Individual was not able to stand on either the right or left foot for more than 2 seconds. Standing balance was functional for static standing for a limited time. He refused any lift testing and weighted carries stating he had "Had enough". Evaluator was therefore unable to formally assess his dynamic balance during functional work activities.

**Mental**

Patient was alert and oriented to person, place and time. He appeared to have difficulty following directions as evidenced by repeated explanations needed to complete general paperwork/questionnaires. Mental processes appeared slow to understand written instructions and he needed redirection to continue with completing paperwork.

**ROM**

AROM was noted to be within normal limits for the right and left elbow, forearm and wrist. Please refer to FCE Upper Extremity Goniometric testing for shoulder AROM. Please also refer to Goniometric Lower Extremity testing for AROM. Evaluator's observations are stated in FCE Summary.

---

[1] Waddell's signs are physical maneuvers that are useful in evaluating persons complaining of low back pain. A positive Waddell's sign may suggest that pain is due to psychological, rather than organic, causes.

> **Present/Appearance**
> Client appears lethargic with movement. Eyes are very red.
> General appearance is sickly.

A.R. 538. The examiner suggested that during the FCE, Miller had not put forth a reliable effort. The examiner also noted that Miller's pain rating was not sensible, his strength presentation and body mechanics were inconsistent with his diagnosis, and his movement patterns, hand function, limitations, and diagnosis-based limitations were not consistent. A.R. 537.

On March 15, 2006, the day after the FCE, Theodore R. Liautaud, D.O., a psychiatrist, conducted a mental health evaluation of Miller. R. 551-555. Again, Miller was referred for this examination by his attorney. Dr. Liautaud described the results of the mental status examination as follows:

> Mr. Dennis Miller, whose DOB is X/X/53, is a 52 year old, married and divorced x2, ambulatory male. He was marginally dressed and groomed, displayed habit deterioration, there was psychomotor retardation, he was just adequately nourished, hydrated, and developed, had difficult maintaining eye contact at times. Speech revealed significant thought latency. Intellect has concern for early dementia, most likely compatible with alcoholic amnestic disorder, but he also reports that he believed he had a history of a small stroke. Mr. Miller reports that he doesn't feel he's depressed, denies anxiety, he reports vague paranoid ideation, people do not like him. Denied auditory or visual hallucinations and does have recurrent obsessive thought that he's a walking dead man and should be dead, and he reports he thinks about that quite a bit of the time. Mr. Miller was alert, he was oriented to time, place, and person, the date was March 14, 2006, he knew he was in Sac City, memory revealed deficits of registration, short-term, and remote recall, he was only able to remember 1 ½ objects after four minutes. His ability to abstract is concrete, his ability to calculate and concentrate is somewhat diminished, he has a diminished fund of general knowledge of current events. Mr. Miller's mood was considered dysphoric

6

at times, especially with talking about the situation where he feels he's a walking dead man and his affect was constricted and perplexed, again he reports he doesn't feel he's depressed, doesn't feel anxious, does not have any overt symptoms of thinking disorder, hallucinations, or paranoia. There is some concern of possible religious delusion. Mr. Miller reports sleep problems, reports problems falling asleep, maintaining sleep, intrusive thoughts, rare occasional terminal insomnia. He reports excessive sleep, reports he sleeps 15 to 16 hours a day or more. Reports energy and stamina loss, he's tired all the time, reports decreased appetite but maintaining weight, denies crying spells, reports some mood swings but denies irritability, denies temper and anger control problems, denies aggressive, assaultive behaviors, destruction of property or self-mutilation, however when asked if he was hopeless or helpless, reports life seems that way. Reports avoidant and withdrawn behaviors, reports concentration and memory problems. When asked about self-esteem he wishes he could get back to work but now feels that this will not happen, there's some nihilistic thinking, when asked about guilt he was vague in response to that. When asked if he had suicidal ideation again he reports that he thinks back to the statement of Dr. Jolan that if he didn't have the surgery he would be dead, and then again reports he feels he's a walking dead man, but denied any previous attempt at self-harm.

A.R. 553-54.

Dr. Liautaud diagnosed Miller as suffering from major depressive disorder, and suggested the following treatment plan:

> Mr. Miller is somewhat ambivalent about the diagnosis of depression. He reports that he's had two unsuccessful placements on antidepressants in the past but does agree to see a therapist and will refer to Mr. Jim Coats for cognitive behavioral therapy, and if Mr. Miller's mood symptoms deteriorate to the point that he would require antidepressant therapy, he would be referred back to this office.
>
> Mr. Scott, his attorney, had called today's date and discussed the situation. Feels that Mr. Miller is disabled, certainly with

> his medical condition and stamina issues, which includes his severe back pain, sciatica and gastrointestinal symptoms. It's felt that he would have difficulty maintaining stamina of full-time employment. It's felt that he does have a mild component of affective disorder, also concern for obsessive component. Do feel he has an impairment related to functional limitations that is due to his medical condition. Information in regard to disability and in regard to that will have to be elicited from University of Iowa.

A.R. 554-55.

Three witnesses testified at the ALJ hearing on March 21, 2006: Miller; his mother, Verna Mae Miller; and Vocational Expert ("VE") Tom Audet.

Miller testified that at the time of the hearing he was 52 years old and was living alone in a house in Lakeview, Iowa. Before that, he lived with his parents in their home 25 miles away. He has not worked since before the first ALJ hearing on October 23, 2002.

Miller often has diarrhea, and as a result, he continually feels like he has the stomach flu. It bothers him to eat, so he eats small amounts, but frequently. When he eats, he must stand or lie down – he cannot eat sitting up. After he eats, he feels weak and has to lie down. If he does not lie down, he feels pain, pressure, or discomfort. He must rest frequently, and he often sleeps from 12 to 20 hours a day. If he does not get enough sleep, he feels weak and tired.

Miller has problems walking. He feels something pinching in his back, and walking makes it tighter and it starts to rub. He has trouble standing upright because he has pain in his back going down his left leg, so he puts all of his weight on his right leg. He can stand without pain for at most a half-hour at a time.

Miller testified his doctors have not put any limits on his activities because of any health problems. However, he does not believe he can do any work.

Miller has not been back to the University of Iowa Clinic since April 2005. However, he has been seeing his family doctor, Dr. Lesec Marcheskie, in Sac City.[2] Miller last saw Dr. Marcheskie a few weeks before the March 2006 hearing, to renew some prescriptions. At that time, he was taking naproxen, pancrelipase, Darvocet, Flomax, and something for depression.

Miller has never received treatment from a mental health professional. Although the doctors in Iowa City prescribed medication for depression, he stopped taking the medication because it was not "doing [him] any good," and because it made his heart rate fluctuate. A.R. 576. He quit smoking cigarettes in December 2005, but he continues to smoke a pipe. Miller stated that he had tried as hard as he could to complete the tests in the FCE, but he was unable to do some of the tests, and others caused his heart rate to go too high.

Miller does not do his own cooking, cleaning, laundry, or shopping. His mother does his shopping and washing and some of his cleaning. Miller testified that he sometimes will make soup and a sandwich, and he probably could go to the grocery store and shop if he needed to. He has a driver's license and can drive.

Verna Miller testified that she drove her son to the hearing because he is unable to drive longer distances. She provides him with financial support, and occasionally cleans his house. In her observation, he sleeps a lot, he cannot walk for very long, he eats standing up, and he has bouts of diarrhea. She testified he has not gone back to Iowa City because he cannot tolerate the ride. She also confirmed he stopped taking his "depression pills." She testified he would not be able to hold a job.

The final witness was the VE. The VE testified that if Miller's testimony is accepted, he cannot work. The ALJ then asked the following hypothetical question:

---

[2]In his ruling, the ALJ stated that he had asked Miller's lawyer to provide Dr. Marcheskie's medical records, A.R. 291, but the records were never submitted. *See* A.R. 573-74.

> [A]ssume that a person can occasionally lift or carry 20 pounds, frequently 10 pounds, could stand, walk or sit about six hours of any eight hour day, push/pull is unlimited, postural activities could be done occasional[ly], no manipulative, visual, communicative or environmental limits. Would such a person be able to do any entry level employment?

A.R. 591-92. The VE responded, "Yes," and identified a number of jobs the hypothetical person could perform. A.R. 592.

In his decision, the ALJ ruled that Miller has the following severe impairments: "history of chronic pancreatitis, history of pancreatic pseudocyst, gastroesophageal reflux disease, and degenerative disk disease." A.R. 287. The ALJ noted Miller had been diagnosed as suffering from major depression by Dr. Liautaud, but the ALJ discounted the diagnosis and found that Miller's mental impairments were not severe. The ALJ stated, "Dr. Liautaud's conclusions are not easily understandable and certainly [are] not supported." A.R. 288. He also pointed out that Dr. Liautaud had described Miller's mental impairment as mild, and did not prescribe any medication.

The court agrees with the ALJ's conclusions concerning the probative value of Dr. Liautaud's opinions. Although Dr. Liautaud "felt that [Miller] does have a mild component of affective disorder," and was concerned with an "obsessive component," the only impairment he observed relating to a functional limitation was "due to his medical condition." A.R. 555. His source of information on Miller's medical condition was Miller's lawyer, and on that subject, the doctor deferred to the University of Iowa Clinic.

The ALJ also decided to give the FCE no weight. The court agrees with this decision as well. The FCE examiner concluded that Miller had not put forth a reliable effort. A.R. 537. The examiner also noted that Miller's pain rating was not sensible, his strength presentation and body mechanics were inconsistent with his diagnosis, and his movement patterns, hand function, limitations, and diagnosis-based limitations were not

consistent. The court finds that any value of the FCE was significantly eroded by these deficiencies, and the ALJ was justified in ignoring it.

The court notes that the ALJ found Miller's testimony concerning his disability was not credible. Miller has not challenged this finding, *see* Doc. No. 11, so the court accepts it. In any event, the court finds the ALJ's credibility analysis was appropriate under *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984).

Based on the hypothetical question containing the impairments found by the ALJ to be credible, the ALJ's finding that Miller has the residual functional capacity to perform a wide range of light work is justified. *See Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997) (hypothetical question is "sufficient if it sets forth the impairments which are accepted as true by the ALJ"); *House v. Shalala*, 34 F.3d 691, 694 (8th Cir. 1994); *Cruze v. Chater*, 85 F.3d 1320, 1323 (8th Cir. 1996) (citing *Stout v. Shalala*, 988 F.2d 853, 855 (8th Cir. 1993) (only impairments substantially supported by the record as a whole must be included in the ALJ's hypothetical).

Considering the record as a whole, the court finds substantial evidence exists to support the Commissioner's decision that Miller is not disabled. Accordingly, the Commissioner's decision is **affirmed**, and judgment will be entered for the Commissioner and against Miller.

**IT IS SO ORDERED.**

**DATED** this 23rd day of March, 2009.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT